## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SAMUEL YAROSH, JR. both     :
individually and derivatively on behalf:
of FOX DEVELOPMENT, INC.
113 Hawthorne Court
Rockaway, NJ 07866
              Plaintiff,   :
                         :

       v.               :

CAROLE SALKIND        :
1304 Carter Drive
Rockaway, NJ 07866,
                         :

MORTON SALKIND      :
1304 Carter Drive
Rockaway, NJ 07866,
                         :

STEVEN SALKIND        :
7 Magnolia Lane
Mt. Arlington, NJ 07856,
                         :

PETER ROSEN           :
1210 Carter Drive
Rockaway, NJ 07866,
                         :

ROSEN & AVIGLIANO     :
431 Route 10
Randolph, NJ 07869,
                         :

BARBARA COHEN       :
1104 Bush Circle
Rockaway, NJ 07866,
                         :

JOHN HARRIS           :
1104 Bush Circle
Rockaway, NJ 07866,
                         :

JOHN QUINN            :
69 North Street
Dover, NJ 07801,
                         :

MALLER, EDIDIN & COMPANY, P.C.:
555 Skokie Blvd., Suite 260     :
Northbrook, Il 60062-2833,    :

**Jury Trial Demanded**

CIVIL ACTION   *04-1816*
NO.        *(JCL)*

ANSEL EDIDIN
c/o Maller, Edidin & Company, P.C.
555 Skokie Blvd., Suite 260
Northbrook, Il 60062-2833,

INFRAME, INC.
1304 Carter Drive
Rockaway, NJ 07866,

DAN BATES
549 4th Street
Manhattan Beach, CA 90266,

ULYSSES CORPORATION
431 Route 10
Randolph, NJ 07869,

JUCONTEE T. WOEWIYU
37 Warrington Place
East Orange, NJ 07017,

SABAL INDUSTRIES
431 Route 10
Randolph, NJ 07869,

LIBERTY SPEEDWAY
431 Route 10
Randolph, NJ 07869,

MAPLE INDUSTRIES
431 Route 10
Randolph, NJ 07869,

GIANT ASSOCIATES
431 Route 10
Randolph, NJ 07869,

ACME ASSOCIATES, INC.
431 Route 10
Randolph, NJ 07869,
OMLAND ENGINEERING
54 Horsehill Road
Cedar Knolls, NJ 07927,

and

LEISURE HEIGHTS, INC.                    :
431 Route 10                             :
Randolph, NJ, 07869,                     :
                                         :
                         Defendants. :
                                         :
_____  :

## COMPLAINT

Plaintiff, Samuel Yarosh, Jr. ("Yarosh"), both individually, and derivatively on behalf of Fox Development, Inc., for his complaint against the defendants, alleges, with knowledge respecting his own actions and, otherwise upon information and belief, as follows:

### Jurisdiction and Venue

1.    This action is brought alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* and the statutory and common law of the State of New Jersey. This court has jurisdiction over this action by virtue of 18 U.S.C. § 1965(a)(RICO), 28 U.S.C. § 1331 (federal question) and general principals of pendent jurisdiction. The matter in controversy exceeds, exclusive of interest and costs, the sum of $100,000.

2.    This action also alleges multiple causes of action pursuant to New Jersey common law including claims of fraud, conversion, conspiracy, unjust enrichment, breach of fiduciary duty, and breach of duty of loyalty.

3.    Venue is predicated on 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b)(2).

### Parties

4.    Plaintiff, Yarosh, is an individual New Jersey resident with an address as

set forth in the caption.

5.     Plaintiff, Fox Development, is a New Jersey corporation with an address as set forth in the caption.

6.     Defendant, Carole Salkind ("C. Salkind"), is an individual New Jersey resident with an address as set forth in the caption.

7.     Defendant, Morton Salkind ("M. Salkind"), is an individual New Jersey resident with an address as set forth in the caption.

8.     Defendant, Steven Salkind ("S. Salkind"), is an individual New Jersey resident with an address as set forth in the caption.

9.     Defendant, Peter Rosen ("P. Rosen"), is an individual New Jersey resident with an address as set forth in the caption.

10.    Defendant, Rosen & Avigliano is a New Jersey law firm with an address as set forth in the caption.

11.    Defendant, Barbara Cohen ("B. Cohen"), is an individual New Jersey resident with an address as set forth in the caption.

12.    Defendant, John Harris ("J. Harris"), is an individual New Jersey resident with an address as set forth in the caption.

13.    Defendant, John Quinn ("J. Quinn"), is an individual New Jersey resident with an address as set forth in the caption.

14.    Defendant, Maller, Edidin & Company, P.C., is an Illinois professional corporation with an address as set forth in the caption.

15.    Defendant, Ansel Edidin, is a principal and shareholder in defendant, Maller, Edidin & Company, P.C., and is an individual Illinois resident with an address

-4-

as set forth in the caption.

16.    Defendant, InFrame, Inc., is a New Jersey corporation with an address as set forth in the caption.

17.    Defendant, Dan Bates, is the president of defendant, InFrame, Inc., and an individual California resident with an address as set forth in the caption.

18.    Defendant, Ulysses Corporation, is a New Jersey corporation with an address as set forth in the caption.

19.    Defendant, Jucontee T. Woewiyu, is an individual resident of New Jersey with an address as set forth in the caption.

20.    Defendant, Sabal Industries, is a New Jersey corporation with an address as set forth in the caption.

21.    Defendant, Liberty Speedway, is a New Jersey corporation with an address as set forth in the caption.

22.    Defendant, Maple Industries, is a New Jersey corporation with an address as set forth in the caption.

23.    Defendant, Giant Associates, is a New Jersey corporation with an address as set forth in the caption.

24.    Defendant, Acme Associates, Inc., is a New Jersey corporation with an address as set forth in the caption.

25.    Defendant, Omland Engineering, is a New Jersey corporation with an address as set forth in the caption.

26.    Defendant, Leisure Heights, Inc., is a New Jersey corporation with an address as set forth in the caption.

### Summary of This Action

27.    This action arises out of an illegal and ongoing scheme by the defendants to (a) defraud Yarosh from profits earned from the highly lucrative construction and sale of senior housing in Rockaway, New Jersey (the "senior housing development"); (b) defraud the United States government and the State of New Jersey from taxes owed on the profits earned from the senior housing development; and  (c) defraud Rockaway Township from fees due from the development.

### General Background

28.    Plaintiff, Yarosh is an experienced New Jersey real estate developer and builder who had the vision to develop as a retail mall 68 acres of property located in Rockaway Township along Route 80 and identified as block 11302, Lot 48 ("Lot 48").

29.    In furtherance of his efforts to develop Lot 48, throughout the early 1990's Yarosh commissioned numerous studies to determine the feasibility of several types of development on the parcel including residential, retail, and office development.

30.    In 1995, Yarosh was in the position to develop the property but needed assistance in financing the purchase thereof.  To this end, Yarosh's attorney, P. Rosen placed Yarosh in touch with defendant, M. Salkind, who was also a client of P. Rosen.

31.    Soon after meeting, Yarosh and M. Salkind orally agreed to be equal partners in the development of Lot 48 through Fox Development, a corporation held by M. Salkind.

32.    Pursuant to this agreement M. Salkind would pick up future costs and Yarosh would continue to put the project together including design, planning, and construction.

33.     The project was ultimately approved for development as a senior community to be called Fox Hills.

34.     Yarosh worked diligently to complete the development and dedicated his experience, connections, efforts, money and construction equipment to Fox Hills without any additional compensation.

35.     Yarosh also contributed several hundred thousand dollars to Fox Development including direct payments totaling $250,000 and the payment of tens of thousands of dollars worth of invoices owed to vendors, consultants, and contractors by Fox Development.

36.     Yarosh continued to work on the Fox Hills development in reliance upon the oral agreement that M. Salkind and Yarosh were to be equal partners and that Yarosh would receive one half of the profits on the Fox Hills development.

37.     Rather than pay Yarosh his fair share of the profits - which would have amounted to millions of dollars - M. Salkind and the other defendants entered into a scheme whereby the revenues and profits of Fox Development were diverted to the defendants and other entities and listed on the books of Fox Development as expenses. Upon information and belief, the amount of these illegal disbursements totaled in excess of $23.5 million.

38.     In addition to these illegal disbursements, M. Salkind was able to further reduce and/or eliminate the revenues of Fox Development by entering false accounting entries on the books of Fox Development.  Upon information and belief, these false accounting entries and false expenses total nearly $9 million.

39.     Over several years, this scheme deprived Yarosh of millions of dollars he

was owed in profits.  It also deprived the Federal and state governments of millions of dollars in tax payments and deprived Rockaway Township of hundreds of thousands of dollars in fees related to the Fox Hills development.

### Factual Background

40.     Yarosh has been involved in the construction and real estate management and development business since he was nine years old and began to work for his father, an experienced New Jersey builder.  He has built over two hundred homes in his career, has managed large housing developments, has subdivided parcels of real estate for himself and others, and has run a hazardous waste disposal business.

41.     Yarosh's experience has made him familiar with many state building and land development regulations including those of the Department of Community Affairs ("DCA") and Department of Environmental Protection ("DEP").

42.     From the years 1983 until 1994, Yarosh served as councilman on the Rockaway Township Town Council.  His experience in development led him to become a member of the Board of Adjustments as well as a liaison between the Rockaway Township Planning Board and Council.  His experience on the Town Council included being Council President for four years and appointed acting Mayor for a few months in 1991 and 1992.

### Yarosh's Plan for Lot 48

43.     Beginning in or about 1990 Yarosh attempted to put together a proposed development on the site of Lot 48.

44.     Possible development scenarios for Lot 48 included retail space, townhouses, and commercial office space.

45.    At all relevant times, Yarosh was represented by his attorney P. Rosen. The scope of P. Rosen's representation of Yarosh included, but was not limited to, Yarosh's efforts to develop Lot 48.

46.    Due to a restrictive covenant held by Corporate Property Investors ("CPI"), the owner of an adjacent parcel on which the Rockaway Mall was located, Lot 48, if developed for retail use, could not exceed 100,000 square feet.

47.    In furtherance of his goal to develop Lot 48, in March of 1994, Yarosh commissioned several studies by the engineering firm Schoor-DePalma, including feasability studies and conceptual plans for each of his proposed development scenarios - a 100,000 square foot retail project, a townhouse project, and an office space project.

48.    Yarosh believed that the retail mall scenario was the most promising and held the highest potential for profit.

49.    Yarosh actively sought merchants to fill retail space in the proposed retail development at Lot 48.  To this end, he contacted Harry Rosen of D.L. Rosen & Company who provided Yarosh with a list of retail prospects who were actively seeking new locations in New Jersey and were not already established in the Rockaway, New Jersey market.

50.    Harry Rosen believed that Lot 48 had significant potential as a retail mall but felt that 100,000 square feet was too small to develop.

51.    On or about February 17, 1995, on behalf of Yarosh, P. Rosen negotiated terms pursuant to which CPI would permit K&S Development ("K&S") to develop up to 180,000 square feet of retail space on Lot 48 in consideration of the payment of

$350,000 to CPI and CPI's option to take 100,000 cubic yards of soil from Lot 48 for future expansion at Rockaway Mall.

52.   K&S was a corporation controlled by Yarosh which had been formed for him by his counsel, P. Rosen.

53.   Thereafter, Yarosh commissioned the engineering firm, Schoor DePalma to prepare a feasibility study and concept plans for a 180,000 square foot retail mall on Lot 48.

54.   Yarosh also commissioned a study to establish that Lot 48 was compromised of dirt instead of bedrock to show to potential funders that Lot 48 could be developed at a reasonable cost.

55.   In June of 1995, Harry Rosen provided Yarosh with numerous letters of interest and intent from various retail enterprises to lease space at the proposed retail mall. Among the interested parties were Media Play, Linens & Things, and Zany Brainy.

## The Agreement Between Yarosh and M. Salkind

56.   In April of 1995, Yarosh mentioned to his attorney, P. Rosen, that he was in need of a financial partner to develop Lot 48 as a retail mall.

57.   In order to discuss financing, P. Rosen placed Yarosh in touch with M. Salkind, another client of P. Rosen.

58.   On or about May 1, 1995, Yarosh, and M. Salkind met at the Plaza Diner in Secaucus, New Jersey.

59.   During this meeting, Yarosh explained to M. Salkind his retail plans for

-10-

Lot 48 and told M. Salkind of the interest he had already received from numerous retailers.

60.    M. Salkind was enthusiastic about the development potential of Lot 48 and praised Yarosh on the work he had done to investigate and advance the development.

61.    Before meeting with M. Salkind, Yarosh commissioned and paid for several critical studies on Lot 48.

62.    M. Salkind acknowledged that Yarosh had spent significant amounts of money and energy to obtain studies to confirm the development potential of Lot 48 as well as the lifting of the restrictive covenant which previously existed on retail development of Lot 48.

63.    M. Salkind and Yarosh agreed to join as equal partners in the development of Lot 48 as a retail mall.

64.    M. Salkind repeated Yarosh's equal ownership of the development of Lot 48 on numerous occasions thereafter.

65.    M. Salkind and Yarosh agreed that development of Lot 48 as a retail mall required a zoning change from residential/office to retail.  Zoning change was an expensive process requiring approval by the Rockaway Township Planning Board ("Planning Board") and Rockaway Township Council ("Council").  The application would be expensive because it required a hearing before the Planning Board only after costly studies were prepared to support the requested change.

66.    M. Salkind agreed to provide the financing for the zoning change.

67.    M. Salkind also committed to obtain the financing for the purchase of Lot

48 and its subsequent development once the zoning change was approved.

68.    Yarosh's partnership responsibilities included, *inter alia*, obtaining retail tenants, designing the development, hiring the engineers, architects, and any necessary consultants and actually building the development.

69.    M. Salkind insisted that he take the lead on all presentations made to the Planning Board and Township Council for the zoning change and ultimate approval of the development.

70.    M. Salkind told Yarosh that they would form a business at a later date which would run the development of Lot 48 and of which they would be equal owners.

71.    M. Salkind later offered to use an already existing corporation, Fox Development, to serve as the corporation to develop Lot 48.

72.    In the relevant time period, the only purpose for which Fox Development was to be used was the development of Lot 48.

73.    Yarosh would learn years later that M. Salkind and other defendants intended to loot Fox Development and use its resources and revenues for their own personal benefit and to finance other projects entirely unrelated to any development of Lot 48 and in which Yarosh had no ownership interest.

74.    Subsequent to the May 1995 agreement, Yarosh advised Schoor DePalma, the engineering consultant he had previously retained, that M. Salkind was now a partner in the development, that M. Salkind was now responsible for expenses related to the development, and that all future invoices were to be submitted to Fox Development.

75.    Yarosh remained Schoor DePalma's contact person at Fox Development

-12-

and regularly met with Schoor DePalma engineers and spoke with them by telephone in order to discuss the Lot 48 development.

76.     On or about March 27, 1996, M. Salkind represented to Yarosh that he wanted to lock Yarosh in as a partner in Fox Development and the Lot 48 project and required that Yarosh contribute a $200,000.00 investment for additional project costs.

77.     M. Salkind told Yarosh that the job was increasing in scope and expense and that Yarosh's significant efforts were not sufficient to justify his 50% ownership interest in Fox Development.

78.     Yarosh issued a check from the SMH Builders, Inc. ("SMH"), a construction company wholly owned by Yarosh, account to Fox Development in the amount of $200,000 and presented it to M. Salkind at the Claremont Diner in Clifton, New Jersey.

79.     In July and August 1996 M. Salkind solicited Yarosh for additional funding.

80.     Again, M. Salkind told Yarosh that the job was increasing in scope and expense and that he needed additional funds from Yarosh.

81.     Yarosh ultimately wrote a check for $50,000.00 to Fox Development from the account of SMH and presented it to M. Salkind at the Empire Diner in Parsippany, New Jersey.

82.     After both payments by Yarosh, M. Salkind reasserted that they would be equal partners in the development of Lot 48.

83.     In reliance upon these representations, Yarosh continued to devote his time and resources to the Lot 48 development without compensation.

-13-

84.     Upon information and belief, defendant, M. Salkind had no intention of honoring his oral agreement with Yarosh and planned at all times to defraud Yarosh of his ownership interest in Fox Development while, at all times, encouraging Yarosh to commit his valuable resources to the Lot 48 development, for which he received no compensation.

**The Zoning Change and the Change in Development Scenario to Senior Housing**

85.     On or about May 17, 1995, Fox Development contracted Schoor DePalma to prepare and submit an application to the Planning Board for a zoning change for Lot 48. The goal was to change the zoning of the property from the current OR-1 zone (office/retail) to a B-1 zone which would permit development of retail space.

86.     On or about May 26, 1995, Fox Development submitted to the Rockaway Township Planning Board an application for development and for zone change of Lot 48 from OR-1 zone to the B-1 zone.

87.     Simultaneously, P. Rosen, acting as counsel for Fox Development, submitted a letter to the Rockaway Township Mayor and Council explaining the reason for the zoning change request and requesting permission to appear at the hearing to address the request.

88.     In response to the application, the Planning Board required that Fox Development submit feasibility studies and conceptual plans to develop Lot 48 for both retail and townhouses.

89.     Before it would hold a hearing on the zoning change, the Planning Board wanted to compare the studies and plans for the two different scenarios (retail and townhouse).

-14-

90.   On behalf of Fox Development, Yarosh paid for the townhouse studies and plans prepared by Schoor DePalma because they were required by the Planning Board but M. Salkind refused to pay for them.

91.   In August of 1995, Rockaway Township denied the zoning change for development of retail space.

92.   Despite the denial of the zoning change, at the council meeting, councilwoman Harriett Lerner suggested that Fox Development consider a zoning change to permit senior housing on Lot 48.

93.   Yarosh and M. Salkind agreed that development of senior housing on Lot 48 could be profitable if the site accommodated enough units.

94.   Initially, Yarosh believed that Lot 48 could accommodate at least 400 senior housing units and drafted plans to demonstrate this to M. Salkind.

95.   M. Salkind agreed with Yarosh that 400 senior housing units were enough to make the development profitable.

96.   Yarosh estimated that the profits from the senior housing development would likely total tens of millions of dollars, of which he would receive one half according to his partnership agreement with M. Salkind.

97.   Thereafter, M. Salkind again confirmed to Yarosh that they would be equal partners in the development of the senior housing development to be called Fox Run (later changed to "Fox Hills").

98.   In reliance upon these representations, Yarosh continued to devote his valuable time and resources to the Fox Hills development without compensation.

99.   In August of 1995, M. Salkind instructed Yarosh to pursue the purchase

-15-

of Lot 48 because it was scheduled for tax sale in approximately two weeks.

100.   The then-Rockaway Township mayor, Frank Maddaloni, lent his support to Fox Hills so long as it was limited to 406 units.

101.   On or about September 5, 1995, Rockaway Township passed Ordinance #20-95 pursuant to which the Planning Board recognized the need to make appropriate changes to the zoning of Lot 48 and recommended the creation of a new zone which will permit retirement communities.

102.   In the fall of 1995, Yarosh worked with P. Rosen and M. Salkind on the purchase of the necessary parcels of land for the senior housing development.

103.   Throughout the period of negotiation of the purchase, Yarosh met with engineers, architects, and banks regarding the design of the development and the financing thereof.

104.   Lot 48 was purchased by Fox Development.

105.   Subsequent to the purchase of Lot 48, M. Salkind and Yarosh met at the Claremont Diner at which time M. Salkind again confirmed that Yarosh and M. Salkind would be equal partners in the development and that M. Salkind would provide the financing and Yarosh would arrange for the planning and construction of the development.

106.   In reliance upon these continued representations, Yarosh continued to devote his valuable time and resources to the Fox Hills development without compensation.

107.   In late 1995, Yarosh began to design Fox Hills with engineers at Schoor DePalma and architect, Barton Associates, including the layout of roads and buildings.

-16-

108.   Throughout late 1995 and 1996, Yarosh met with representatives of several banks including New York Urban, Summit, and Corestates regarding financing Fox Development's development of Fox Hills on Lot 48.

109.   At the request of M. Salkind, and because M. Salkind lacked the experience to do so, in preparation for the financing applications, Yarosh prepared cost analyses for the development of Fox Hills.

110.   Yarosh possessed the required construction experience to prepare the analyses.

111.   In December 1995, M. Salkind and P. Rosen advised Yarosh that his financial statement and resume were necessary to obtain financing for the development of Lot 48.

112.   Although M. Salkind was responsible for obtaining financing, Yarosh was expected by M. Salkind to serve as guarantor due to his ownership interest in Fox Development.

113.   In reliance upon M. Salkind's repeated representations that Yarosh and M. Salkind were equal partners in Fox Development, Yarosh agreed to act as guarantor of the financing thereto and provided his financial and business information as requested.

114.   On or about December 7, 1995, at the instruction of M. Salkind, Yarosh wrote a check for $5,000 from an account of SMH to New York Urban Services, Inc. as a loan application fee for a proposed loan to Fox Development.  M. Salkind later opted not to pursue financing with New York Urban.

115.   In August of 1996, M. Salkind and P. Rosen submitted a loan application

-17-

to Summit Bank for financing for Fox Hills.

116.    The application documents to Summit reflected that C. Salkind and Yarosh would guarantee 90% and 10% respectively of any funds issued.

117.    M. Salkind told Yarosh that the 10% apportionment to Yarosh did not reflect the true proportion of his ownership of Fox Development and, again assured Yarosh that he would be an equal partner in the development of Fox Hills.

118.    Instead, M. Salkind explained that the bank did not believe Yarosh's financial condition permitted him to guarantee more than 10% of the debt required to develop Fox Hills.

119.    In reliance upon these representations, Yarosh continued to devote his valuable time and resources to the Fox Hills development without compensation.

120.    In late 1997 and throughout 1998, M. Salkind told Yarosh that Yarosh could not be listed as an owner of Fox Development and that his name could not appear on any documents related to the financing and development of Fox Hills.

121.    Yarosh had previously been involved in political disputes with the Rockaway Township Mayor, John Inglesino ("Inglesino") and his Town Administrator, David Fischer ("Fischer").

122.    In retaliation, when they learned that Yarosh and M. Salkind were partners in Fox Development, Inglesino and Fischer told P. Rosen that the Fox Hills development would never start if Yarosh were involved.

123.    In order to falsely convince Inglesino and Fischer that Yarosh had no role in Fox Hills other than as an employee, M. Salkind fabricated a sham return to Yarosh of $50,000 (which was represented as Yarosh's investment in Fox Development) in the

offices of Schoor DePalma.

124.   M. Salkind immediately took the check back and Yarosh was not actually repaid the $50,000.

125.   Thereafter, for the benefit of the Fox Hills development and in reliance upon the repeated representations of M. Salkind regarding their partnership in Fox Hills, Yarosh did not request that his ownership interest in Fox Development and Fox Hills be memorialized in writing.

126.   Yarosh knew that the Planning Board and any bank providing financing for Fox Hills would require a listing of any individual or entity with an ownership interest in the project.

127.   If his ownership interest were disclosed, M. Salkind convinced Yarosh that Inglesino and Fischer would sabotage the project and Yarosh's opportunity to earn millions of dollars in profits therefrom.

128.   In late 1997, after it was clear that Yarosh's name could not appear on any ownership or financing documents, M. Salkind applied to Valley National Bank for financing for the Fox Hills development.

129.   In February of 1998, Fox Development obtained financing from Valley National Bank.

130.   Despite not being listed as an owner on the loan documents, in reliance upon the repeated representations of M. Salkind that they would be equal owners of Fox Development, Yarosh continued to devote his time and resources to the Fox Hills development without compensation.

**Yarosh's Work on the Development of Lot 48, Leben Care, and Bodner**

-19-

131.   Throughout 1995, 1996, and most of 1997, Yarosh worked exclusively on different phases of the Fox Hills development project.  He interviewed architects and subcontractors.  He prepared bid estimates for all phases of construction.  He designed buildings and consulted with engineers.  He took care of all aspects of the project that were required to obtain approval of the Planning Board.  He had numerous meetings with M. Salkind and P. Rosen to discuss all aspects of the project.

132.   All of this work was performed by Yarosh without compensation but in reliance upon the representations of M. Salkind that they were equal partners in Fox Development.

133.   In early 1996, Yarosh met with architects who submitted bids for Fox Hills.  All of these architects, including Barton and Associates, the firm which was ultimately commissioned, dealt directly with Yarosh and had minimal dealings with M. Salkind or any other representative of Fox Development.

134.   It was not until Yarosh had approved the Barton and Associates bid that Fox Development got involved when it executed a contract with the architect.

135.   By late 1996, the scope of the Fox Hills project had grown to 584 senior citizen units and a 100 bed assisted living complex.

136.   Prior to the start of construction of Fox Hills on Lot 48, Yarosh proposed to M. Salkind that the adjacent Lot 10 be purchased and incorporated into the Fox Hills development.

137.   At his own expense, Yarosh again commissioned relevant studies and prepared designs to demonstrate to M. Salkind that Lot 10 could support two additional buildings.

-20-

138.   In order to expand the scope and profitability of the Fox Hills development, M. Salkind purchased Lot 10 and other parcels using Fox Development funds while placing title to the parcels in the names of other corporations his wife, defendant, C. Salkind, owned but that he controlled.

139.   M. Salkind assured Yarosh that the new parcels would later be transferred to Fox Development and that Yarosh and M. Salkind would be equal partners in Fox Development.

140.   In reliance upon these representations and his desire to increase the profitability of the Fox Hills project, Yarosh continued to devote his time and resources to the development of Lot 10 without compensation.

141.   As a result of the purchase of Lot 10, Fox Development moved the 100 bed assisted living community to Lot 10 and increased the number of units at Fox Hills to 684, thereby greatly increasing the profitability of the project.

142.   The assisted living community project on Lot 10 was later named Leben Care by M. Salkind.

143.   In 1995, when Yarosh investigated the purchase of Lot 10 he also looked at the nearby Bodner property ("Bodner").

144.   Yarosh suggested to M. Salkind that if Fox Hills was successful than Bodner should be considered for similar development.

145.   Yarosh initially felt that Bodner could support eight buildings with 336 senior housing units and drafted plans to demonstrate this capacity to M. Salkind.

146.   In reliance upon the representations of M. Salkind and his desire to increase the profitability of the Fox Hills project, Yarosh continued to devote his time

and resources to the Bodner development without compensation.

147.   M. Salkind did not immediately act to purchase Bodner.

148.   Instead, another individual, Morel Segal, entered into an agreement with the owner of Bodner to purchase Bodner for development as townhouses so long as the development was approved by the Planning Board.

149.   M. Salkind, who wanted to purchase Bodner for himself, conspired with Mayor Inglesino, and councilman, Lou Sceusi (who, with his wife, owned Lars Associates, an advertising agency which received more than $1 million in fees from Fox Development) to prevent Morel Segal from obtaining Bodner by presenting an ordinance to the Council which, if approved, prohibited development of townhouses and rendered Bodner economically unattractive to Morel Segal.

150.   The ordinance dragged on for months without approval before Morel Segal lost interest and withdrew from the purchase of Bodner.

151.   Using Fox Development funds, M. Salkind purchased Bodner in April of 2003 and, upon information and belief, has either entered into a joint venture agreement with U.S. Homes to develop the parcel for senior housing or has agreed to sell the Bodner property to U.S. Homes.

152.   Despite the fact that Fox Development funded the purchase of Bodner, Fox Development will receive no funds from any sale of the parcel or from any joint venture related to Bodner.

153.   M. Salkind never transferred ownership of Leben Care or Bodner to Fox Development and, upon information and belief, never intended to. Instead, M. Salkind led Yarosh to believe that the properties would be merged into Fox Development in

which he had an ownership interest, and that he would earn millions of dollars in profits therefrom, in order to secure his invaluable services without compensation.

154.   After the development of Lot 48 was approved by Rockaway Township in early 1997, Yarosh focused on hiring subcontractors for Fox Hills.

155.   Yarosh also spent substantial time in 1997 correcting an error in the design of the sewer system for Fox Hills which would have been fatal to the development.

156.   In May of 1997, Fox Development opened a sales office in the adjacent Rockaway Mall to sell units of Fox Hills.

157.   Yarosh negotiated the lease for the office, brought in defendant, Cohen (who had previously been the realtor on Yarosh's development projects) and Morris Fox Realty as realtor and broker of record for Fox Hills, and in reliance upon the representations of M. Salkind and his desire to increase the profitability of the Fox Hills project, funded much of the renovations to the office space without any reimbursement or contribution from M. Salkind or Fox Development.

158.   Despite the agreement that M. Salkind would provide the initial funding, after entering into the partnership with M. Salkind, Yarosh continued to pay thousands of dollars in invoices to engineers and other contractors for work directly related to the development of Fox Hills when M. Salkind and Fox Development failed to pay them.

159.   It is believed that Yarosh paid in excess of $30,000 worth of invoices submitted to Fox Development which M. Salkind failed to pay despite repeated requests but which were necessary to continue the development of Fox Hills.

160.   Throughout the project, in reliance upon the representations of M.

-23-

Salkind and Yarosh's desire to increase the profitability of the Fox Hills project, as part of his contribution to the partnership with M. Salkind, Yarosh committed his construction equipment to the Fox Hills development without any compensation from Fox Development.

161.   The fair rental value of the machinery and equipment is estimated to exceed $500,000.00.

162.   This time and equipment was committed without compensation based upon the repeated assurances of M. Salkind that he and Yarosh were equal partners in Fox Development.

### The Approval of the Development Plan and the Developer's Agreement

163.   In order for any development to occur in Rockaway Township, New Jersey, a developer's agreement between the town and the developer must be approved by the Planning Board.

164.   The developer's agreement is drawn up by the town attorney who incorporates therein the approving resolution from the Planning Board Attorney.

165.   Once a development plan is approved by the Planning Board, it is sent to the Council which must then approve the developer's agreement.

166.   The developer's agreement attempts to, *inter alia*, protect Rockaway Township from liability for the project as well as provide the township with fees. The amount of the insurance, bonds (both cash and paper), and the fees required for a development are each based on the projected cost of the site improvements which is calculated by the developer's engineer and set forth in the developer's agreement.

167.   Accurate calculation of the construction costs is critical to the Township

-24-

because the greater the cost of the project the larger the fee that goes to the township.

168.   In order to defraud Rockaway Township of fees to which it was legally entitled, M. Salkind schemed to submit to the Planning Board an intentionally false and undervalued projected cost estimate for Fox Hills.

169.   Normally the Township's engineer, Lisa Ryden, and the Township's attorney have sufficient knowledge and experience to review the plans and see whether the developer's engineer's construction cost estimate is reasonable.

170.   With regard to the Fox Development developer's agreement ("Developer's Agreement"), neither the township engineer, Lisa Ryden, nor the township attorney conducted a reasonable investigation of the proposed agreement.

171.   Upon information and belief, the actual cost of the site improvements was $7.2 million but was listed in the Developer's Agreement as $3.2 million.

172.   Upon information and belief, the Township lost approximately $500,000.00 in fees that it should have collected if the estimate had been accurate.

173.   A significant portion of the under-valuation of the cost of site improvements derives from the Developer's Agreement's wholesale omission of the cost of soil excavation from its cost estimate.

174.   A reasonable estimate of the amount of soil to be excavated in order to develop Fox Hills called for the excavation of 1 million cubic yards of soil. At a cost of $3.50 per cubic yard, this amounted to an undervaluation of approximately $3.5 million which should have been added to the cost of site improvements in the Developer's Agreement.

175.   In addition to the cost estimate, before a builder can start developing a

site he must obtain insurance on the project which indemnifies the Township from any liability. This insurance is in a form of a bond which covers 100% of the improvements (10% in cash and 90% in a paper bond). In addition, the developer pays 5% of the overall project cost directly to the Township in cash to cover the Township's engineering costs to inspect the development as it progresses.

176. As set forth above, the total improvement cost set forth in the Developer's Agreement was intentionally under valued by M. Salkind by at least 60%. This undervaluation permitted Fox Development to post a bond which was significantly less than what was required under Township ordinance.

177. In addition, the 10% of the improvement costs that Fox Development had to provide in cash was less than it should have been as was the 5% which was paid directly to Rockaway Township.

178. Had the Developer's Agreement accurately reflected the cost of the site improvements, the 10% cash that Fox Development had to pay to the Township would have required approximately $400,000.00 more in cash.

179. Moreover, upon information and belief, by grossly undervaluing the improvement costs, Fox Development saved considerably on the costs of the paper bond. The bond for $3.2 million in improvements cost Fox Development approximately $80,000.00. Had the site improvements been accurately reported in the Developer's Agreement, the cost of the bond would have probably been an additional $80,000.00.

180. On or about March 19, 1998, Third Year Insurance Agency Associates bid to M. Salkind for a bond premium of $80,000.00. This bid was based upon the cost estimates of the Developer's Agreement. Had the estimate been accurate, the bond cost

would have been much more expensive. M. Salkind saved at least $50,000.00 in bond premiums.

181. Although the bonding should have been in place at the start of the job on September 4, 1997, the cash bond was not put up until nearly eleven months after the start of the job and was half of what it should have been.

182. M. Salkind boasted to Yarosh that Fox Development would have no resistance in getting approval for the Developer's Agreement because M. Salkind "knew the mayor", Inglesino, who was elected mayor of Rockaway Township in the Fall of 1995.

183. Upon information and belief, prior to the approval of the Developer's Agreement, Inglesino solicited campaign donations from M. Salkind to fund his planned run for New Jersey State Assemblyman in the Spring of 1997.

184. In June of 1997, Inglesino's campaign fund - Morris County First - received $20,000.00 from M. Salkind. $10,000.00 came directly from M. Salkind. $10,000.00 was donated through Fox Development.

185. This $20,000.00 accounted for a large portion of the just over $100,000.00 that Inglesino spent on his unsuccessful assembly race.

186. In March of 1996, although it might have commenced earlier David Millner ("Millner"), the mayor's public relations director, began to bill Fox Development $2,500.00 per month for public relations services.

187. Millner's invoices were, in fact, a sham and Millner never performed any such services on behalf of Fox Development.

188. Millner accepted this money although he knew that he was not entitled

-27-

to the payments.

189.   Millner received at least $7,500 from Fox Development for work he allegedly performed as a public relations consultant.

190.   These payments were, in reality, a means to curry favor with Mayor Inglesino by making payments to his political associate, Millner.

191.   M. Salkind and P. Rosen knew that the payments to Millner were without merit but viewed them as a means to both ensure the approval of Fox Hills and reduce the profits of Fox Development by charging the payments to Millner as expenses.

192.   On or about January 30, 1997, the Developer's Agreement was executed between Rockaway Township and Fox Development.

193.   Yarosh neither negotiated nor prepared either the Developer's Agreement or the development cost estimates nor did he review it before it was submitted to the township attorney and township engineer.

194.   Upon information and belief, due to the political clout of M. Salkind as well as the large political donations made by M. Salkind to Inglesino, who was then running for New Jersey State Assemblymen, the Township engineer, Lisa Ryden, did not examine the figures in the Developer's Agreement and approved it without scrutiny.

### Fox Development's Construction of Fox Hills

195.   On or about June 25, 1997 the Fox Hills project received all of the necessary "subject to" approvals.

196.   In June of 1997, immediately after Fox Development received Planning Board approval to build Fox Hills, the town of Dover filed suit in Morris County Court

to stop the development based upon the belief that the Fox Hills development plan provided inadequate storm water management (the "Dover suit").

197.   M. Salkind and Yarosh met with former Rockaway Township municipal attorney John Dorsey ("Dorsey") at Paul's Diner in Mountain Lakes, New Jersey to request that he represent Fox Development and defend the Dover suit.

198.   Dorsey told M. Salkind that he would only represent Fox Development if Yarosh were a partner therein.

199.   M. Salkind assured Dorsey that Yarosh was a partner in Fox Development.

200.   In reliance upon this representation, Dorsey agreed to represent Fox Development and successfully defended Fox Development's development approval in Superior Court in New Jersey.

201.   Yarosh engaged a water geologist to design a system of wells and water treatment systems to provide both potable and irrigation water to Fox Hills and other proposed developments, Bodner and Leben Care, which Yarosh believed were to be transferred to Fox Development.

202.   On or about September 7, 1997 the Fox Hills job started, the ground was broken on the project and retaining walls were built.

203.   Initially, 150,000 cubic yards of earth had to be excavated from Lot 48 to gain access to the project and begin construction.

204.   This dirt was moved to Rockaway Mall pursuant to the earlier agreement with CPI which had been secured by Yarosh.

205.   Once the project began, Yarosh and M. Salkind agreed that they would

each receive an equal disbursement from Fox Development in the form of an annual salary of $100,000.00.

206.   Prior to this salary agreement, Yarosh had been working on Fox Hills for two years without compensation in reliance upon the repeated representations of M. Salkind that Yarosh was to receive 50% of the profits of the Fox Hills development.

207.   Rather than collect the salary himself, M. Salkind named his wife, defendant, C. Salkind president of Fox Development and had the salary paid to her.

208.   C. Salkind was listed as "President" on numerous other corporations controlled by M. Salkind.

209.   C. Salkind performed no work for Fox Development or on the Lot 48 project which would merit the substantial salary she received.

210.   The salaries to Yarosh and M. Salkind (paid to C. Salkind) were supposed to be equal and, if increased, were to be increased equally.

211.   In 1997 and 1998, both Yarosh and C. Salkind were paid $100,000.00 by Fox Development.

212.   In 1999, both Yarosh and C. Salkind were paid $125,000.00 by Fox Development.

213.   In 2000 Yarosh was paid $125,000.00 while C. Salkind received at least $125,000.00 but probably more from Fox Development.

214.   In 2001, Yarosh received $125,00.00 while C. Salkind received at least $250,000.00 but probably more from Fox Development.

215.   In 2002, Yarosh received $125,00.00 while C. Salkind received at least $720,000.00 but probably more from Fox Development.

216.   M. Salkind did not seek Yarosh's authorization to increase C. Salkind's salary nor did C. Salkind perform any services for Fox Development or Fox Hills to merit the dramatic salary increases.

217.   The salary increases to C. Salkind were hidden from Yarosh.

218.   Upon information and belief, defendants, C. Salkind, M. Salkind, and P. Rosen always intended to divert money from Fox Development via the inflated salary to C. Salkind.

219.   This diversion of Fox Development funds to C. Salkind through false salary payments totaled approximately $1,350,000.00 which had the effect of reducing the profits of Fox Development.

220.   Defendant, J. Quinn, was the Fox Development employee responsible for the Fox Development payroll and assisted M. Salkind in the diversion of funds from Fox Development.

221.   When Yarosh confronted M. Salkind about the disparity between his annual salary ($125,000) and the salary received by M. Salkind (through his wife, C. Salkind) ($720,000), M. Salkind conceded to Yarosh that the salary was a form of money laundering.

222.   Beginning in December of 1997, M. Salkind established an office at the realty sales office for Fox Hills.

223.   M. Salkind was working in the sales office although his wife was collecting a substantial salary from Fox Development for performing no work or services whatsoever.

224.   M. Salkind did arrange for his own salary by drawing a monthly payment

of approximately $9,800 which was listed on the Fox Development books as an inexplicable "real estate expense". This real estate expense totaled approximately $117,600 annually.

225.   Upon information and belief, no other real estate agent for Fox Hills or Morris Fox Realty received a similar payment of a real estate expense.

226.   In 1999, defendant, J. Harris joined the company as M. Salkind's assistant. Harris was responsible for many monetary transactions and wrote checks on behalf of Fox Development under M. Salkind's instructions and with M. Salkind's authority.

227.   In 2000, Marc Papa ("M. Papa") was hired by M. Salkind for Morris Fox Realty as a real estate agent. His responsibilities grew to include data entry including the entry of expenses in the Fox Development books.

228.   In June 2000, Fox Development sold the first units at Fox Hills.

229.   Throughout the Fox Hills project, Yarosh and M. Salkind generally met weekly for dinner at Charlie Brown's restaurant in Denville, New Jersey.

230.   Whenever the issue arose, M. Salkind confirmed that Yarosh and M. Salkind would be equal partners in Fox Development and would share equally in the profits from Fox Hills.

231.   M. Salkind represented to Yarosh, however, that Fox Development had not yet turned a profit.

232.   In May of 2002, while M. Salkind was in Chicago meeting with his accountants, defendants, Ansel Edidin and Maller, Edidin & Company, P.C., to finalize his year-end financials and tax returns for years 2000 and 2001, M. Salkind called

-32-

Yarosh to tell him that Fox Development had two poor years and had not yet turned a profit.

233.   Upon information and belief, defendants, Ansel Edidin and Maller, Edidin & Company, P.C., knew that Fox Development had earned a substantial profit in 2000 and 2001.  Despite this knowledge, Ansel Edidin and Maller, Edidin & Company, P.C. assisted M. Salkind in his scheme to defraud Yarosh and the Federal and state governments by helping M. Salkind alter the books of Fox Development to reflect false increased expenses and an overall loss.

234.   Again, in June of 2003, while M. Salkind was in Chicago meeting with his accountants, defendants, Ansel Edidin and Maller, Edidin & Company, P.C. to finalize his year-end financials and tax returns for 2002, he called Yarosh to tell him that Fox Development had still not turned a profit.

235.   Upon information and belief, defendants, Ansel Edidin and Maller, Edidin & Company, P.C., knew that Fox Development had earned a substantial profit in 2002. Despite this knowledge, Ansel Edidin and Maller, Edidin & Company, P.C. assisted M. Salkind in his scheme to defraud Yarosh and the Federal and state governments by helping M. Salkind alter the books of Fox Development to reflect false increased expenses and an overall loss.

236.   M. Salkind apologized to Yarosh for the failure of Fox Development to earn a profit on the Fox Hills project and offered to make it up to Yarosh by making Yarosh a partner in other projects which M. Salkind was developing and in which Yarosh could have an ownership interest memorialized in writing without adverse consequence from Inglesino or Fischer.

237.   In reality, Fox Hills has earned a profit in excess of $50 million for Fox Development, none of which was ever paid to Yarosh.

238.   M. Salkind, in conjunction with other defendants, altered the books of Fox Development and diverted funds from Fox Development in order to defraud Yarosh from the profits he rightfully earned in Fox Development and the Federal and state governments of taxes owed to them.   This scheme also fraudulently deprived Fox Development of its assets.

239.   Due to the repeated representations of M. Salkind to Yarosh regarding the profitability of Fox Development, it was not until June of 2003 that Yarosh had reason to believe that Fox Development had, in fact, turned a profit and began to investigate the financial condition of Fox Development.

## M. Salkind's Violation of Building Codes and Environmental Regulations

240.   Yarosh was solely responsible for overseeing the construction of the first building at Fox Hills.

241.   In keeping with his practice as a contractor and developer, Yarosh made certain that the building satisfied all applicable building codes and environmental regulations and received all necessary permits, inspections, and certifications.

242.   Once the first building was completed, Yarosh remained general manager of the development.  M. Salkind, however, took a more active role in overseeing the development and immediately began to cut corners in an effort to save money.

243.   M. Salkind's cost saving measures included violations of regulations of the New Jersey Departments of Environmental Protection ("DEP") and Community Affairs ("DCA"), agreements with the Fox Hills Home Owner's Association ("HOA"),

and various state and Federal statutes and regulations.

244.   For example, in violation of DCA regulations, M. Salkind substituted cheaper stucco finish for stone finish on certain Fox Hills buildings.

245.   In May of 1997, Professional Plan Engineers Union New Jersey ("PPE") was engaged by Rockaway Township (at Fox Development's expense) to review the construction plans for Fox Hills and advise Fox Development and Rockaway Township of the necessary inspections and certifications.

246.   PPE detailed to Fox Development the inspections that were required for each Fox Hills building.

247.   Without any intention of actually satisfying these requirements, M. Salkind had contractors represent to PPE that the requirements were being met.

248.   M. Salkind knew that PPE was retained only as a consultant and would not verify that the required inspections were actually conducted.

249.   For example, M. Salkind instructed the architect, Barton and Associates to send a letter to PPE stating incorrectly that certain requirements were being met by Fox Development.

### M. Salkind's Use of Fox Development to Launder Money

250.   M. Salkind furthered his tax evasion scheme and scheme to defraud Yarosh of his rightfully earned profits through money laundering.

251.   Fox Development employed many illegal aliens who desired to obtain legal residency status.

252.   M. Salkind concocted a scheme whereby he advanced funds to the workers ($2,500.00 each) for legal assistance toward residency, which payments were

charged to Fox Development as expenses.

253.   M. Salkind then recouped the advanced legal fees by taking regular deductions from the paychecks of each of the workers receiving the advances until the advances were paid off.

254.   M. Salkind was aided in this scheme by J. Quinn, the Fox Development employee responsible for payroll and benefits.

255.   Upon information and belief, none of the workers ever obtained legal status because M. Salkind would not release the financial records of Fox Development as required by the Immigration and Naturalization Service ("INS").

256.   In addition, as previously noted, the disparity between his annual salary ($125,000) and the salary received by M. Salkind (through his wife, C. Salkind) ($720,000) in 2002, was, according to M. Salkind, a form of money laundering.

### M. Salkind's Illegal Diversion of Fox Development Funds

257.   Upon information and belief, M. Salkind and the other defendants diverted Fox Development earnings to other individuals and entities who had no relation to the Fox Hills project or Fox Development, were not involved in the Fox Hills project, and were not entitled to these payments.

258.   The purpose of the diverted payments was to defraud Yarosh by depriving him of the Fox Development profits to which he was entitled, to defraud the Federal and state government of tax revenues, and to loot Fox Development for the benefit of the defendants and their friends and for the benefit of other development projects completely unrelated to Fox Hills.

259.   Among these diverted payments are the following:

| | |
|---|---|
| a.  Entities that performed work on other M. Salkind projects but not on Fox Hills | approximately $5,000,000.00 |
| b.  Personal expense items of M. Salkind | approximately $2,000,000.00 |
| c.  Disbursements to or for the benefit of S. Salkind | approximately $1,500,000.00 |
| d.  Disbursements to or for the benefit of C. Salkind | approximately $70,000.00 |
| e.  Disbursements to or for the benefit of P. Rosen | approximately $9,000.00 |
| f.  Disbursements to or for the benefit of B. Cohen | approximately $17,000.00 |
| g.  Disbursements to or for the benefit of J. Harris | approximately $6,000.00 |
| h.  Wire transfers from Fox Development to the Valley National Bank account of C. Salkind | approximately $13,000,000.00 |
| i.  Inflated salary to C. Salkind | approximately $1,350,000.00 |

260.   The amount of these and other illegal disbursements totals in excess of $23,000,000.00.

261.   In addition to the aforementioned illegal disbursements, M. Salkind was able to reduce, and/or eliminate the revenues of Fox Development by entering false accounting entries on the books of Fox Development.

262.   These false accounting entries included totally fictitious expense amounts written on checks that never existed which were entered in the books in the approximate amount of $8,000,000.00.

263.   In addition, the false accounting entries included increased expense amounts in which the actual check was written in one amount but the books at Fox

-37-

Development reflect that the checkbook was written in a much greater amount.  The approximate amount of this category of false accounting entries is $1,000,000.00.

264.   The total amount of the false and fraudulent accounting entries and expenses is approximately $9,000,000.00.

265.   M. Salkind further reduced the profits of Fox Development by characterizing non-expense payments, including, but not limited to the repayment of Yarosh's $250,000 initial investment and the payment of a $100,000 escrow fee to Louis Sceusi, as business expenses.

### Improper Diversion of Fox Development Money to Carol Salkind

266.   Each purchaser of a Fox Hills unit selected the amenities for the unit including such items as rug quality, and grade of plumbing and lighting fixtures. While a certain grade of each was included in the base purchase price of each unit, purchasers could opt for higher grade for a higher price.

267.   Rather than add the upgrade charge to the price of the unit, M. Salkind furthered his scheme to defraud Yarosh, Fox Development, and the state and Federal governments by requiring that upgrades be paid for separately from the cost of the unit and in cash.

268.   M. Salkind deposited each of the upgrade payments in an account with Valley National Bank in the name of the project, Fox Hills (the "395 Account").

269.   Throughout the course of this scheme, Yarosh had no knowledge of the 395 Account or the improper and illicit diversion of Fox Development funds to the 395 Account.

270.   Upon information and belief, the funds deposited in the 395 Account exceeded $5 million.

271.   The funds in the 395 Account properly belonged to Fox Development.

272.   M. Salkind subsequently transferred approximately $1.4 million from the 395 Account to an account in the name of his wife, C. Salkind (the "304 Account").

273.   Fox Development held four bank accounts with Valley National Bank: (1) P. Rosen's Trust Account into which deposits and down payments on Fox Hills' units were deposited until closing; (2) a main operating account (the "300 Account"); (3) a secondary operating account used primarily for payroll (the "5000 Account"); and (4) the 395 Account, described above.

274.   M. Salkind and C. Salkind regularly transferred funds from Fox Development's 300 Account to C. Salkind's 304 Account.

275.   Over the life of the Fox Hills development and the scheme to defraud Yarosh, approximately $11 million was transferred from the 300 Account to C. Salkind's 304 Account although this number is believed to be much greater.

276.   Between the diversions from the 395 and 300 Accounts, more than $13 million was improperly taken from Fox Development and transferred to C. Salkind's 304 Account although this number is believed to be much greater.

### False and Inflated Expenses

277.   Each May or June, M. Salkind traveled to Chicago to meet with his accountants, defendants, Ansel Edidin and Maller, Edidin & Company, P.C., who also performed accounting services for M. Salkind's businesses, including Fox Development.